IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 6:13-cr-00378-AA-1 |
| Plaintiff, | **OPINION AND ORDER** |
| vs. | |
| MATTHEW LYNN HANSON, | |
| Defendant. | |

AIKEN, District Judge:

Now before the Court is defendant Matthew Hanson's Motion to Reduce Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) (doc. 76). Specifically, defendant seeks a reduction of his sentence to time served and a revision of his supervised release conditions to include a term of home confinement. Defendant asserts that his chronic medical conditions, which include asthma, lung disease, and a history of pulmonary embolisms stemming from a blood clotting disorder, coupled with unsafe conditions at Federal Correctional Institution ("FCI") Terminal Island, place him at

a heightened risk of complications and long-term side effects associated with his prior contraction of COVID-19 and possible reinfection. The Government opposes the motion. For the following reasons, the motion is GRANTED.

## BACKGROUND

On September 22, 2015, defendant pleaded guilty to one count of distribution of child pornography in violation of 18 U.S.C. § 2252A(a)(2) and (b)(1), and one count of possession of child pornography in violation of 18 U.S.C. § 2252(a)(5)(B) and (b)(2). Doc. 86 at 9-10. Defendant was caught in an undercover sting operation by the Federal Bureau of Investigations ("FBI") in which an agent posed as a father with an eight-year old daughter in an online chatroom. Doc. 81 at 1-2. Over a three-week period, defendant sent the agent materials depicting child pornography, discussed the logistics of the agent traveling to Oregon with his daughter, and indicated that he had arranged a hotel reservation to meet with a separate man and his thirteen-year old daughter. Doc. 81 at 2-3. Following defendant's arrest and a search of his residence, a forensic review of defendant's computer revealed forty-three images of child pornography and four videos, but agents did not find evidence of an actual thirteen-year old girl he intended to meet. Doc. 81 at 2-3.

Defendant was sentenced to eighty-seven months of confinement and a ten-year term of supervised release. Doc. 52 at 28. Having served just under four years of his sentence at FCI Terminal Island, defendant has approximately twenty-eight months remaining with a projected release date of October 22, 2022.[1]  Doc. 76 at 8.

---

[1] Hanson has been accepted into the Residential Drug Abuse Program (RDAP), the completion of which would qualify him for a one-year reduction pursuant to 18 U.S.C. § 3621(e)(2)(B). If such a

After his initial appearance and arraignment on September 11, 2013, defendant was granted pretrial release. Following sentencing, the Court granted defendant ninety days in which to self-surrender to BOP custody. Doc. 44. The Court granted defendant's requests for four extensions of time, which together extended his surrender date from April 20, 2016 to August 19, 2016, on which date he began serving his sentence. Docs. 58, 60, 62, 64.

On April 27, 2020, defendant contracted COVID-19. Doc. 85 at 3. The Bureau of Prisons ("BOP") asserts that defendant is now recovered, but there is no indication that defendant has received a follow-up test for COVID-19 since his initial diagnosis. On May 3, 2020, defendant submitted a written request for compassionate release to FCI Terminal Island's Warden. To date, there has been no formal response from the Warden to that request. Defendant filed the present motion with the Court on June 8, 2020, and oral arguments were heard on June 30, 2020.

## LEGAL STANDARD

A district court generally "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see Dillon v. United States*, 560 U.S. 817, 824–25 (2010). Compassionate release under 18 U.S.C. § 3582(c)(1)(A) provides an exception in rare cases. As amended by the First Step Act, 18 U.S.C. § 3582(c)(1)(A) authorizes courts to modify terms of imprisonment as follows:

> [T]he court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the

---

reduction were granted, Hanson's projected release date would be October 2021. The Bureau of Prisons ("BOP") has, however, halted all such programming to date. Doc. 76 at 8.

receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—

(i) extraordinary and compelling reasons warrant such a reduction; [. . .]

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

18 U.S.C. § 3582(c)(1)(A).

The relevant policy statement for sentence reductions under the compassionate release statute is found in the U.S. Sentencing Guidelines, § 1B1.13. The policy statement identifies several "extraordinary and compelling reasons," U.S.S.G. § 1B1.13(1)(A) & cmt. 1, requires a finding that the defendant does not pose a danger to others or the community under the factors provided in 18 U.S.C. § 3142(g), *id.* § 1B1.13(2), and observes that "[t]he court is in a unique position to determine whether the circumstances warrant a reduction . . . after considering the factors set forth in [§ 3553(a)] and the criterial set forth in this policy statement, such as . . . whether the defendant is a danger," *id.* § 1B1.13 cmt. 4.

Defendant bears the burden to establish that he satisfied the procedural prerequisites for judicial review and compelling and extraordinary reasons to justify compassionate release. 18 U.S.C. § 3582(c)(1)(A).

## DISCUSSION

As an initial matter, defendant's motion is properly before the Court because more than thirty days have passed since defendant submitted his request and the

Warden has not responded to it. *See Brown v. United States*, 411 F. Supp. 3d 446, 452 (S.D. Iowa 2019) ("Exhaustion occurs when the BOP denies a defendant's application or lets thirty days pass without responding to it") (internal citations omitted).

The remaining questions for the Court are: (1) whether defendant has presented extraordinary and compelling reasons for a sentence reduction considering the § 3553(a) sentencing factors, and (2) whether a reduction will be consistent with applicable policy statements from the Sentencing Commission, particularly, whether defendant is a danger under the § 3142(g) factors. The Court will assess each of these prongs in turn.

### I. *Extraordinary and Compelling Circumstances*

Defendant argues that his preexisting medical conditions, which include asthma, lung disease, and a history of pulmonary embolisms stemming from a blood clotting disorder, place him at a heightened risk of complications associated with his prior COVID-19 infection and possible reinfection. These risks are exacerbated by defendant's placement at FCI Terminal Island, a "coronavirus hotspot" which reported 706 inmates and staff currently infected or recovered from COVID-19 as of June 4, 2020.[2] Defendant argues that as a result of the outbreak, that the facility's capacities are stretched and it is ill-equipped to handle the dangerous and imminent problems relating to blood clots or other complications defendant may suffer should

---

[2] This figure appears to be up-to-date as of June 30, 2020, per the BOP website (https://www.bop.gov/coronavirus). However, it is unclear how often the BOP updates these statistics, nor is the Court convinced these numbers accurately reflect the full extent of the COVID-19 outbreak within BOP facilities.

his condition worsen or reappear. The Government argues that defendant's recovery from COVID-19 demonstrates BOP's ability to adequately address defendant's unique medical needs. The Government also emphasizes the severity of defendant's underlying offense and contends that defendant remains a risk to the community.

### A.   *Circumstances*

Section 1B1.13 of the U.S. Sentencing Guidelines identifies four categories of extraordinary and compelling reasons. *See* U.S.S.G. § 1B1.13 cmt. n. 1(A)-(D). As relevant here, § 1B1.13 provides that extraordinary and compelling reasons exist, *inter alia*, when "the defendant is suffering from a serious physical or medical condition, that substantially diminishes the ability of the defendant to provide selfcare within the environment of a correctional facility and from which he or she is not expected to recover" and in circumstances "other than, or in combination with" the other three categories. U.S.S.G. § 1B1.13 cmt. n.1(A)(ii), 1(D). The Court finds that these two categories of circumstances are present in this case.[3]

The Court acknowledges the global crisis caused by the 2019 novel Coronavirus ("COVID-19"). The pandemic has killed thousands, sickened millions, and disrupted stability and security in the lives of billions. As of the hearing on this motion, there have been more than 10.5 million confirmed cases worldwide. *COVID-19 Dashboard by the Center for Systems and Engineering (CSSE) at John Hopkins University (JHU)*,

---

[3] Although the fourth category of "extraordinary and compelling circumstances" from the U.S. Sentencing Guidelines encompasses other circumstances *as determined by the BOP director*, § 1B1.13 cmt. n. 1(D), the Court concludes, for the reasons stated in *United States v. Barber*, that it is not constrained under the current policy statement "by the BOP Director's determination of what constitutes extraordinary and compelling reasons for a sentence reduction." No. 6:18-cr-00446-AA-1, 2020 WL 2404679, at *6 (D. Or. May 12, 2020) (internal quotation marks omitted).

JOHN HOPKINS UNIVERSITY OF MEDICINE, https://coronavirus.jhu.edu/map.html (last visited July 1, 2020). More than 2.6 million of those cases have occurred in the United States. *Id*. Over 500,000 deaths around the world have attributed to the virus, over 127,000 of which have been reported in this country. *Id*. Further spread of infection and death is likely. Across the world, government and private institutions alike were unprepared for this outbreak or its ramifications. In the United States, "the President has declared a National Emergency due to the spread of the novel coronavirus and states and localities across the nation have implemented measures to stymie its rapid spread." *United States v. Muniz*, No. 4:09-CR-0199-1, 2020 WL 1540325, at *1 (S.D. Tex. Mar. 30, 2020).

Prisoners are particularly vulnerable to infection due to the nature of their incarceration. *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, CENTERS FOR DISEASE CONTROL AND PREVENTION (Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last visited July 1, 2020). Specifically, prisoners are unable to adequately follow social distancing and sanitary guidelines recommended to avoid the spread of infection.

Upon reviewing the documentation submitted, this Court finds that defendant has presented a near textbook example of extraordinary and compelling reasons warranting his early release. His medical conditions are well-documented and severe: defendant suffers a genetic condition that predisposes him to blood clots and he has experienced at least two pulmonary embolisms in the past, both of which

required extended hospitalizations. Defendant also suffers severe asthma, chronic lung disease, and visible lung damage as seen in a recent chest X-ray.

Epidemiologic data indicates that COVID-19 infection may be more severe in patients with asthma, clotting disorders, or lung disease. *See People of Any Age With Underlying Medical Conditions*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited June 30, 2020) (listing hemoglobin disorders, chronic lung diseases, and asthma as risk factors that may increase one's risk of severe illness from COVID-19).

Courts have previously found "extraordinary and compelling circumstances" exist where an inmate suffers severe and chronic medical conditions that put them at an increased risk of complications associated with COVID-19 exposure. *See, e.g., United States v. Norris,* No. 3:17-cr-106 (SRU), 3:18-cr-243 (SRU), 2020 U.S. Dist. LEXIS 70219 (D. Conn. Apr. 16, 2020) (defendant suffers from asthma); *United States v. Smith*, No. 12 CR. 133 (JFK), 2020 WL 1849748, at *1 (S.D.N.Y. Apr. 13, 2020) (defendant has asthma, blood clots, high cholesterol, a thyroid condition, and multiple myeloma); *United States v. Hunt*, No. 18-20037, 2020 WL 2395222 (E.D. Mich. May 12, 2020) (defendant has asthma, congestive heart failure, diabetes, obesity, and sleep apnea); *United States v. McCarthy*, ___F. Supp. 3d ___, 2020 WL 1698732, at *5 (D. Conn. Apr. 8, 2020) (defendant has COPD, asthma, and other lung-related ailments); *United States v. Zukerman*, ___ F. Supp. 3d ___, 2020 WL 1659880, at *5 (S.D.N.Y. Apr. 3, 2020) (defendant has diabetes, hypertension, and obesity); *United*

*States v. Rodriguez*, ___ F. Supp. 3d ___, 2020 WL 1627331, at *12 (E.D. Pa. Apr. 1, 2020) (defendant has diabetes, hypertension, obesity); *United States v. Gonzalez*, No. 18-CR-1536155, 2020 WL 1536155, at *3 (E.D. Wash. Mar. 31, 2020) (defendant is over sixty years old and has COPD and emphysema).

That defendant has been deemed "recovered" by BOP does not change the Court's analysis. First, there is no indication that defendant has tested negative for COVID-19 since his initial contraction of the virus. Second, defendant continues to complain of symptoms that may indicate the presence of a blood clot. Indeed, recent bloodwork confirmed that defendant currently has a lowered International Normalized Ratio ("INR") value, indicating a heightened risk of developing blood clots in persons with clotting disorders. This suggests that defendant is currently infected or may still be suffering from side effects associated with his initial infection. Third, there is no current scientific evidence to indicate that a "recovered" COVID-19 patient is immune from reinfection, as several courts have recently acknowledged. *See, e.g., United States v. Common*, No. 17-CR-30067, 2020 WL 3412233, at *4 (C.D. Ill. June 22, 2020) (granting compassionate relief to a recovered inmate, reasoning that the risk of reinfection "is not merely theoretical"); *United States v. Halliburton*, No. 17-CR-20028, 2020 WL 3100089, at *4 (C.D. Ill. June 11, 2020) (granting compassionate relief to a recovered inmate, explaining that the risk of relapse or reinfection is "very real"); *United States. v. Williams*, PWG-19-134, 2020 WL 3073320 (D. Md. June 10, 2020 (granting compassionate relief to defendant because "[a]lthough recovered, it is uncertain whether [the defendant] can contract COVID-19 more than once, and the

potential long-term effects of the illness are still undetermined); *see also Immunity Passports in the Context of COVID-19*, WORLD HEALTH ORG., www.who.int/news-room/commentaries/detail/immunity-passports-in-the-context-of-covid-19 (last visited June 30, 2020) (stating that "[t]here is currently no evidence that people who have recovered from COVID-19 and have antibodies are protected from a second infection").

The Government's argument that defendant's alleged recovery demonstrates FCI Terminal Island's ability to care for his medical needs is unpersuasive. Notwithstanding the above-mentioned concerns regarding defendant's alleged status as "recovered," the Court remains concerned about FCI Terminal Island's ability to provide adequate care in light of defendant's complex medical needs. The Court is not convinced that FCI Terminal Island has been successfully mitigating the risk of infection, given the high numbers of infected inmates and defendant's own contraction of the virus. To the facility's credit, defendant was apparently issued compression stockings to facilitate blood flow through his lower extremities, and his dosage of anti-coagulation medicine was doubled in response to his concerning lab values. He also received testing to assess concerns that defendant may have developed blood clots in his legs and chest. The Court views these preventative measures, however, as minimal in light of the severity and complexity of defendant's combined medical conditions.

Defendant's ability to provide self-care within the environment of the correctional facility is similarly limited by the complexity of defendant's medical

needs. Defendant is in no position to provide self-care in response to a blood clot should one develop. Any preventative measures that defendant might normally take on his own (for example, exercise) are restricted by the small size of defendant's living quarters and further compounded by the facility's current lockdown status.

Considering the above information and circumstances of defendant's confinement, the Court concludes that defendant is suffering from chronic and serious medical conditions which significantly diminish his ability to provide self-care in the environment where he is held. *See United States v. Colvin*, 2020 WL 1613943, at *4 (D. Conn. Apr. 2, 2020).

### B.   *§ 3553(a) Factors*

Next, the Court reviews the § 3553(a) factors. In imposing a sentence which is "sufficient, but not greater than necessary," a court considers, among other things, the nature and circumstances of the offense, the history and characteristics of the defendant, community safety, the kinds of sentences available, the need to avoid unwanted disparities in sentencing, and all other obligations of sentencing including punishment, deterrence, and rehabilitation. 18 U.S.C. § 3553(a). The Court is persuaded that the applicable § 3553(a) factors support defendant's request for compassionate release.

The Court acknowledges that defendant's underlying offenses are very serious and that the circumstances surrounding those offenses were a major factor in the eighty-seven-month sentence originally imposed. In particular, the Court found that, although possessing and distributing child pornography is serious, "this case was

something more[.]"  Sent. Tr. (doc. 52) at 21.  At the same time, the Court did not intend that sentence to "include incurring a great and unforeseen risk of severe illness or death brought on by a global pandemic."  *Zukerman*, 2020 WL 1659880, at *6 (internal quotation marks omitted).

At the time of sentencing, defendant had no prior criminal history.  Throughout his three years on pretrial supervision and his period of release following sentencing, defendant complied with his conditions of release, which included electronic location monitoring.  BOP classified defendant as a low-security inmate and in mid-June 2020, using its PATTERN test,[4] assessed that defendant posed a minimum risk of recidivism.  During his four years in custody, defendant has had no disciplinary action against him and has engaged in a wide range of programming.  Notably, defendant completed the Nonresidential Drug Abuse Program and has been accepted into the Residential Drug Abuse Program (RDAP).

Defendant has not, however, participated in sex offender treatment.  The Court agrees with the Government that sex offender treatment is a crucial component of defendant's rehabilitation and reentry process and is needed to ensure community safety.  Defendant's original release plan was deficient in that regard.

Defendant proposed release to his mother's home in Waldport, Oregon, which is in Lincoln County.  The U.S. Probation Office conducted a virtual walk through of

---

[4] The PATTERN test was developed pursuant to the First Step Act.  *See* 18 U.S.C. § 3631(b).  It "includes a diverse set of factors to determine the risk of recidivism for BOP inmates; many of these factors are dynamic, meaning that an inmate's risk of recidivism could change with appropriate programming and services or could be affected by the inmate's behavior."  Office of the Attorney General, *The First Step Act of 2018: Risk and Needs Assessment System – UPDATE*, at 7 (January 2020).

the home and approved it for defendant's residence. In Waldport, defendant would have access to the medical care needed to address his conditions. Several family members submitted letters informing the Court that they are available to drive defendant to his medical and probation appointments and other services that are essential to his success on release. Defendant asserted that he would participate in sex offender treatment, which was included in the original conditions of his supervised release. But he had no plan for a sex offender treatment assessment and no treatment provider in mind. Indeed, it is unclear whether the U.S. Probation Office has a sex offender treatment provider in Lincoln County at this time.

By contrast, the conditions to be ordered, including an initial period of home confinement followed by participation in the Residential Reentry Center ("RRC") in Eugene, Oregon, with close proximity to a well-established sex offender treatment program, will adequately account for defendant's need for sex offender treatment while also allowing defendant to receive the medical care that he needs.

Defendant has served forty-five months of his sentence and has a projected release date of October 22, 2022. This constitutes approximately sixty percent of his sentence, accounting for good behavior credits. The Court finds that this amount of time, when considering defendant's current characteristics and condition, along with the conditions of home confinement, participation in the RRC, and treatment to be ordered adequately expresses the seriousness of the offense, deters criminal conduct, protects the public, and provides defendant with needed treatment in the most effective manner. 18 U.S.C. § 3553(a)(2).

## II. *Dangerousness*

Finally, the Court considers whether defendant presents a danger to the community. U.S.S.G. § 1B1.13(2). Under § 3142(g), a court must consider the following factors in determining whether conditions of release will reasonably assure the safety of any other person and the community: (1) the nature and circumstances of the offense charged, (2) the weight of the evidence against the person, (3) the history and characteristics of the person, and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. 18 U.S.C. § 3142(g).

The Government argues that defendant remains a danger to the community because he has not received sex offender treatment. As discussed above, the Court agrees with the Government that defendant's proposed release plan would not adequately mitigate defendant's risk of reoffending and the associated danger to the community, in general, and children especially. However, as stated on the record, the Court will order conditions of release that do not fully adopt defendant's proposed plan and seek to prioritize community safety. Because defendant requires close supervision, the Court orders defendant to spend the balance of his original term of incarceration on home confinement. During this period, he will be restricted to his residence at all times unless he has prior approval from his probation officer or the Court to leave for a specific activity. The Court may reconsider amending that condition depending on defendant's performance on supervision. While on home confinement, defendant will also be subject to locational monitoring and must keep a

detailed travel log. He will participate in a sex offender assessment in Eugene and begin treatment as soon as possible following his release. When a bed becomes available in the RRC, defendant will reside there, participate in programming and treatment, and be subject to intense monitoring for a period of not more than 120 days. Even after defendant transitions out of the RRC, he will be required to remain in Eugene until his treatment provider feels that it is safe for him to return to Waldport. Defendant will appear for regular status conferences before the Court—his first will take place shortly after his release.

Given Magistrate Judge Thomas Coffin's finding that defendant was not a danger to the community under § 3142(g) when he granted defendant pre-trial release, doc. 4., defendant's performance on pre-trial release, and defendant's record while incarcerated, the Court finds that the conditions of release ordered reasonably assure the safety of others and the community.

## CONCLUSION

The Court finds that defendant has established extraordinary and compelling reasons to warrant a reduction of defendant's sentence under 18 U.S.C. § 3582(c)(1)(A)(i). Defendant's motion (doc. 76) is therefore GRANTED.

All previously imposed conditions remain in place, with the following additional conditions of release:

- Defendant shall be subject to a term of home confinement until October 22, 2020. During this time, defendant must participate in a location monitoring program using technology approved by his probation officer. Location monitoring shall begin on July 6, 2020, or as soon as possible thereafter.

- Defendant shall reside in and participate in the programming at a residential reentry center for not more than 120 days, to be released at the direction of his probation officer.

- Defendant is referred to Dr. Steven Mussack, Ph.D., a psychologist in Eugene for sex offender assessment and treatment.

- Defendant shall keep a detailed travel log to include his destination, purpose of travel and departure and arrival times.

- Defendant shall self-quarantine in a separate room for a period of fourteen (14) days after arriving at his mother's home, unless he tests negative for COVID-19 on release from FCI Terminal Island or upon a medical test conducted in Waldport.

- Defendant shall appear at regularly scheduled telephonic status hearings with the first hearing being set by his probation officer within two (2) weeks of his release from custody.

IT IS SO ORDERED.

Dated this  2nd  day of July 2020.

_____/s/Ann Aiken_____

Ann Aiken
United States District Judge